**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | | |
|---|---|---|
| BALLENTINE EXPRESS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EAN HOLDINGS, LLC, d/b/a Enterprise | ) | No. 2:21-cv-02242-TLP-cgc |
| Rentals, STEVEN D. BARKSDALE, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SHELTER GENERAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL JUDGMENT ON THE**
**PLEADINGS AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S**
**MOTION FOR PARTIAL DISMISSAL**

Here we have a dispute about insurance coverage and who is responsible for buying that coverage. Defendant EAN Holdings, LLC, d/b/a Enterprise Rentals ("Enterprise" or "Defendant"), moves for partial judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 40.) Defendant alternatively moves for partial dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*Id.*) Plaintiff Ballentine Express Corp. ("Ballentine") has responded. (ECF No. 41.) And Defendant has replied. (ECF No. 42.)

For the reasons below, the Court **DENIES** Defendant's motion for partial judgment on the pleadings and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for partial dismissal.

# BACKGROUND

Plaintiff is a "commercial trucking entity" and "for-hire general freight carrier" based in Memphis, Tennessee.  (ECF No. 37 at PageID 255.)  In August 2017, Plaintiff entered into a Master Truck Rental Agreement ("Master Agreement") with Enterprise, under which Plaintiff often rented "commercial vehicles" for its trucking business from Enterprise.  (*Id.*)  Plaintiff alleges that Enterprise sold insurance liability protection "as part of its vehicle rental operation in Tennessee."  (*Id.*)  Plaintiff alternatively alleges that Enterprise "acted as an insurance broker and/or insurance agent as part of its commercial vehicle rental operation in Tennessee."  (*Id.*)

In January 2018, Plaintiff rented a box truck from Enterprise at one of its Memphis locations.  (*Id.* at PageID 256.)  According to the complaint, Defendant knew that Plaintiff rented this truck to "use in [its] commercial trucking business to move freight in interstate commerce."  (*Id.*)  The complaint also states that Defendant gave Plaintiff "the option to purchase insurance liability protection directly from Enterprise to cover the commercial vehicle Ballentine rented that day."  (*Id.* at PageID 256–57.)  Plaintiff bought the insurance policy from Defendant (the "Enterprise Policy").  (*Id.*)  According to Plaintiff, the Master Agreement said "the liability protection offered, if purchased directly from Enterprise, would be Ballentine's primary insurance" for the rented vehicle.  (*Id.* at PageID 257.)

The Master Agreement, which Plaintiff attached to its complaint, contains an "Insurance Requirements" provision:

> Customer agrees at a minimum to obtain and maintain in full force and effect at all times throughout the term of this Agreement the following insurance coverages with respect to the acts or omissions of Customer and/or any of its employees or agents (including all Drivers) and provide a certificate of insurance evidencing:
>
> (a)     unless liability protection for accidents arising out of the operation or use of each Rental Truck is included in the Base Rental Rate as set forth

on the applicable Schedule A,[1] commercial vehicle insurance, including bodily injury liability and property damage liability coverages, covering owned, non-owned and hired autos (including Rental Trucks rented under this Agreement) and insuring Customer's liability for negligence arising out of the use or operation of vehicles by its employees or agents (including all Drivers) with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000; and, where required by law, uninsured and/or underinsured liability coverage, uninsured and/or underinsured property damage coverage and/or personal injury protection in an amount equal to the minimum amount required by applicable state law;

(b)     Physical Damage Insurance (Collision & Comprehensive: Actual cash value of the applicable Rental Truck) covering all Rental Trucks rented pursuant to this Agreement.

Each insurance policy set forth above shall name Enterprise as an additional insured for Customer's contractual obligations under this Agreement and shall include an endorsement stating that such insurance shall not be canceled, modified such that the minimum limits or requisite coverages are no longer in force or non-renewed without thirty (30) days prior written notice to Enterprise.  Customer hereby acknowledges and agrees that the insurance required to be maintained by it under this Section provides "primary coverage" for the protection of Customer with respect to the acts or omissions of Customer and/or any of its employees or agents (including all Drivers) notwithstanding any other coverage carried by Customer or Enterprise insuring against similar risks.  All insurance shall be written through companies having an A.M. Best's rating of at least A-VII or with such other companies as may reasonably be approved by Enterprise.  Customer waives all rights against Enterprise and its agents, officers, directors and employees for recovery of damages to the extent these damages are covered by the insurance required to be maintained hereunder.  Physical damage coverage shall name Enterprise as a loss payee.  Notwithstanding anything to the contrary, should Customer by provided Liability Protection in the rental rate per the applicable schedule, such Liability Protection shall be primary, subject to its terms and conditions, to any similar liability coverage maintained by customer.

(ECF No. 37-1 at PageID 271–72.)

---

[1] The "Optional Products" provision in Schedule A states that "[n]otwithstanding any term to the contrary in the [Master] Agreement, the Base Rental Rate . . . (b) does not include liability protection for accidents arising out of the operation or use of the Rental Truck with N/A upon the terms and subject to the limitations set forth in the applicable Rental Contract and in the insurance policy which provides coverage."  (*Id.* at PageID 268.)

<u>Ballentine's Claims</u>

The day after Plaintiff rented the box truck from Defendant and bought the Enterprise
Policy, one of Plaintiff's employees got into an accident with Defendant Steven Barksdale.
(ECF No. 37 at PageID 258.)  Barksdale sued Ballentine in September 2019 for negligence,
negligence per se, negligent hiring, and negligent supervision in Mississippi state court (the
"Barksdale suit"), claiming damages over $2,000,000.  (*Id.*)

Plaintiff later sued Barksdale and Enterprise here seeking declaratory relief as to the
rights and liabilities of the parties in the Barksdale suit related to the Master Agreement, the
Enterprise Policy, and applicable state and federal laws.  (*Id.* at PageID 263.)   Plaintiff asks the
Court to interpret and apply the Motor Carrier Act of 1980 ("MCA"), 49 U.S.C. § 13901 *et seq*.,
and Federal Motor Carrier Safety Regulations ("FMCSR"), 49 C.F.R. 350 *et seq*., promulgated
by the Federal Motor Carrier Safety Administration ("FMCSA").  (*Id.* at PageID 255.)  Plaintiff
argues the MCA and FMCSR apply here because Plaintiff "was a for-hire general freight carrier,
owned and/or operated commercial vehicles, and was engaged in interstate commerce."  (*Id.*)
And the complaint asserts that Enterprise knew Plaintiff "was a commercial trucking business
that was engaged in interstate commerce" and that Plaintiff used the commercial vehicles it
rented from Enterprise "as part of its commercial trucking business" and "in interstate
commerce."  (*Id.* at PageID 256.)

Plaintiff claims that the MCA, FMCSR, and Tennessee state law require "that all
insurance policies for commercial freight carriers such as Ballentine provide coverage of at least
$750,000.00 and also contain an MCS-90 endorsement establishing financial responsibility of at
least 750,000.00."  (*Id.* at PageID 255.)  Plaintiff also alleges that under the Master Agreement,
"the liability protection offered, if purchased directly from Enterprise, would be Ballentine's

primary insurance" for the rented vehicle.  (*Id.* at PageID 257.)  And Plaintiff claims that Enterprise "represented to Ballentine that the primary liability protection offered through the Master Truck Rental Agreement provided primary coverage sufficient to comply with both state and federal law."  (*Id.*)  Plaintiff bought the Enterprise Policy based on this representation.  (*Id.*)

Plaintiff asserts that Enterprise took on the role of insurer and therefore had the duty to provide liability protection conforming to state and federal law.[2]  (*Id.*)  And Plaintiff alleges that Enterprise "subsequently and repeatedly represented" that it had obtained this coverage on Plaintiff's behalf.  (*Id.* at PageID 258.)  But Enterprise refused to produce a copy of the Enterprise Policy when Plaintiff requested it, even after the Barksdale suit began.  (*Id.* at PageID 258–59.)  Instead, Enterprise sent Plaintiff a letter in June 2020, stating that the Enterprise Policy "provided coverage in the amount of $100,000.00," rather than the $750,000 minimum coverage Plaintiff claims the MCA, FMCSR, and Tennessee law required.  (*Id.* at PageID 259.)  This letter did not mention the required MCS-90 endorsement.  (*Id.* at PageID 260.)

Plaintiff goes on to allege that Enterprise "never offered a defense to the claims from the Barksdale Lawsuit."  (*Id.* at PageID 259.)  And Plaintiff asserts that Enterprise continually refused to produce a copy of the Enterprise Policy until Plaintiff moved to compel discovery in the Barksdale suit.  (*Id.* at PageID 260–61.)  With a copy of the Enterprise Policy in hand, Plaintiff alleges that, "in breach of state law, federal law, the Master Truck Rental Agreement,

---

[2] In the alternative, Plaintiff alleges that as its insurance broker or agent, Enterprise assumed the duty to obtain conforming liability protection on Plaintiff's behalf.  (*Id.* at PageID 257–58.)  The complaint then states, "[h]ad  Enterprise performed this obligation, any commercial vehicle insurance policy obtained on behalf of Ballentine would have—at a minimum—provided the federal and state minimum liability coverage of $750,000.00.  However, Enterprise failed to obtain any commercial vehicle insurance policy on behalf of Ballentine.  Instead, after being notified of the Barksdale Lawsuit, Enterprise attempted to tender $100,000 in coverage purportedly stemming from its own excess policy with Ace American Insurance."  (*Id.* at PageID 258.)

and the express representations made by Enterprise to Ballentine, the purported Enterprise Policy as produced by Enterprise did not name Ballentine as an insured, did not afford primary coverage, failed to provide the FMCSR and Tennessee state law minimum-required liability coverage of $750,000.00, and failed to include an MCS-90 endorsement with regard to the liability protection purchased by Ballentine from Enterprise on January 5, 2018." (*Id.* at PageID 261.)  The policy Defendant produced names only Enterprise as the insured party and provides coverage for accidents involving any user of an Enterprise vehicle, no matter if the customer has bought liability protection from Enterprise. (*Id.*)  Plaintiff contends that Defendant still has not produced "a true and correct copy of the Enterprise Policy." (*Id.* at PageID 262.)

Plaintiff asserts that Enterprise breached the Master Agreement by failing to provide or obtain sufficient insurance liability protection. (*Id.*)  And Plaintiff alleges that Enterprise also breached its duties to it and Barksdale under the MCA and FMCSR by failing to provide adequate coverage or an MCS-90 endorsement. (*Id.*)  And so Plaintiff seeks a declaratory judgment as to the rights and liabilities of the parties in relation to the Barksdale suit. (*Id.* at PageID 263.)

The complaint's request for relief asks the Court to "adjudicate and declare" as follows (1) "that Ballentine purchased a policy of insurance directly from Enterprise (the 'Enterprise Policy') or, in the alternative, that Enterprise obtained on behalf of Ballentine as Ballentine's insurance broker and/or insurance agent, to cover the commercial vehicle that Ballentine rented from Enterprise on January 5, 2018"; (2) "that Enterprise has never produced a true and correct copy of the Enterprise Policy to Ballentine"; (3) "that Enterprise was statutorily mandated by the MCA and FMCSR to provide coverage or, in the alternative, to obtain coverage on behalf of Ballentine as Ballentine's insurance broker and/or insurance agent, of at least $750,000.00 to

Ballentine for the commercial vehicle Ballentine rented from Enterprise on January 5, 2018"; (4) "that Enterprise failed to provide coverage or, in the alternative, failed to obtain coverage on behalf of Ballentine as Ballentine's insurance broker and/or insurance agent of at least $750,000.00 to Ballentine as required by the MCA and FCMSR for the commercial vehicle Ballentine rented from Enterprise on January 5, 2018"; (5) "that Enterprise is the primary insurer for the commercial vehicle Ballentine rented from Enterprise on January 5, 2018"; and (6) "that Enterprise shall be liable for any amount of damages that may be awarded against Ballentine in the Barksdale Lawsuit up to $750,000.00." (*Id.* at PageID 264–65.)  Plaintiff also asks the Court to declare that "an MCS-90 endorsement on any other policy maintained by Ballentine does not, as a matter of law, shift any duties or obligations owed under the MCA and FMCSR." (*Id.* at PageID 264.)

## LEGAL STANDARDS

Courts assess whether a complaint states a claim upon which relief can be granted under the standards for Rule 12(b)(6), as stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), and in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007).  "Accepting all well-pleaded allegations in the complaint as true, the court 'consider[s] the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief.'"  *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 681).  To survive a motion to dismiss under 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

Though a court will grant a motion to dismiss if a plaintiff has no plausible claim for relief, a court must "construe the complaint in the light most favorable to the plaintiff, accept its

allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). But a court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)). When resolving a Rule 12(b)(6) motion to dismiss, "the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020) (quoting *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001)).

Courts take the same approach to Rule 12(c) motions. "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal quotation marks omitted). "A Rule 12(c) motion 'is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law.'" *Id.* at 582 (quoting *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991)).

## ANALYSIS

Defendant now asks the Court for partial judgment on the pleadings because the MCA and FMCSR do not apply to Enterprise or the Master Agreement.[3] (ECF No. 40 at PageID 365.)

---

[3] Plaintiff asserts that the Court should deny Defendant's motion for judgment on the pleadings as premature. (ECF No. 41 at PageID 393.) True enough, Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). And Defendant Barksdale had not yet filed an answer when Enterprise moved for judgment on the pleadings. But because Enterprise alternatively sought dismissal under Rule 12(b)(6), and "[b]ecause the legal standards for adjudicating Rule 12(b)(6) and Rule 12(c) motions are the same," Plaintiff's argument provides little basis to deny

And Defendant contends that the MCA and FMCSR do not impose a legal duty on Enterprise to provide Plaintiff with liability coverage of $ 750,000.00 or an MCS-90 endorsement.  (*Id.*) Defendant also asks the Court to find that the Master Agreement provides liability protection to Plaintiff "in the amount of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence."  (*Id.* at PageID 365–66.) Lastly, Defendant asks that the Court dismiss for failure to state a claim any relief sought under the MCA or FMCSR "as being inapplicable to the contractual agreement" between the parties. (*Id.* at PageID 366.)  The Court will address each point in turn.

## I.       Whether the MCA and the FMCSR Apply to Enterprise

Enterprise argues that the MCA and FMCSR apply only to motor carriers like Plaintiff. (ECF No. 40-1 at PageID 373–74.)  "[T]he Motor Carrier Act of 1980 requires interstate trucking companies to maintain a minimum level of insurance coverage[.]"  *Kline v. Gulf Ins. Co.*, 466 F.3d 450, 451 (6th Cir. 2006) (citing Pub. L. No. 96-296, 94 Stat. 793 (1980); *Harco Nat'l Ins. Co. v. Bobac Trucking Inc.*, 107 F.3d 733, 736 (9th Cir. 1997)); *see also Gramercy Ins. Co. v. Expeditor's Express, Inc.*, 575 F. App'x 607, 608 (6th Cir. 2014) ("[T]he Motor Carrier Act of 1980 . . . requires carriers . . . to carry a minimum level of liability insurance").

The FMCSR includes a provision related to "Minimum Levels of Financial Responsibility for Motor Carriers."  49 C.F.R. § 387.  This provision "applies to for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce."  49 C.F.R. §

---

the motion.  *See Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007); *see also Thomas v. Schroer*, No. 13-cv-02987-JPM-cgc, 2017 WL 6489144, at *10 (W.D. Tenn. Sept. 20, 2017) ("The Federal Rules of Civil Procedure 'govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201.'  Fed. R. Civ. P. 57.  Accordingly, the requirements of pleading and practice in actions for declaratory relief are exactly the same as in other civil actions . . . ."  (internal quotation marks omitted)).

387.3(a).  And it "prescribes the minimum levels of financial responsibility required to be

maintained by motor carriers of property operating motor vehicles in interstate, foreign, or

intrastate commerce."  49 C.F.R. § 387.1.  In this context, "financial responsibility" means "the

financial reserves (e.g., insurance policies or surety bonds) sufficient to satisfy liability amounts

set forth in this subpart covering public liability."  49 C.F.R. § 387.5.

Under the FMCSR, "[n]o motor carrier shall operate a motor vehicle until the motor

carrier has obtained and has in effect the minimum levels of financial responsibility as set forth

in § 387.9 of this subpart."  49 C.F.R. § 387.7(a).  And the minimum level of financial

responsibility for a "[f]or-hire" carrier of nonhazardous property "[i]n interstate or foreign

commerce, with a gross vehicle weight rating of 10,001 or more pounds" is $750,000.  49 C.F.R.

§ 387.9(1).

What is more, under the FMCSA regulation, a motor carrier can prove "the required

financial responsibility" in three ways:

> (1) "Endorsement(s) for Motor Carrier Policies of Insurance for Public Liability
> Under Sections 29 and 30 of the Motor Carrier Act of 1980" (Form MCS-90) issued
> by an insurer(s);
> (2) A "Motor Carrier Surety Bond for Public Liability Under Section 30 of the
> Motor Carrier Act of 1980" (Form MCS-82) issued by a surety; or
> (3) A written decision, order, or authorization of the Federal Motor Carrier Safety
> Administration authorizing a motor carrier to self-insure under § 387.309, provided
> the motor carrier maintains a satisfactory safety rating as determined by the Federal
> Motor Carrier Safety Administration under part 385 of this chapter.

49 C.F.R. § 387.7(d).  As for the MCS-90 endorsement, it is "a special endorsement . . .

providing that the insurer will pay within policy limits any judgment recovered against the

insured motor carrier for liability resulting from the carrier's negligence, whether or not the

vehicles involved in the accident is specifically described in the policy."  *Armstrong v. United*

*States Fire Ins. Co.*, 606 F. Supp. 2d 794, 808 (E.D. Tenn. 2009) (quoting *Illinois Cent. R. Co. v. Dupont*, 326 F.3d 665, 666 (5th Cir. 2003)).

Enterprise argues that "[t]he financial responsibility obligations imposed by the MCA and FMCSR apply only to 'for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce.'"  (ECF No. 40-1 at PageID 377 (quoting 49 C.F.R. § 387.3(a)).)  According to Defendant, Plaintiff—not Enterprise—was responsible for making sure it had the needed coverage and proof of that coverage as the MCA and FMCSR require.  (*Id.* at PageID 381.)  And so Enterprise concludes that it "has no legal duty to provide Ballentine with liability coverage with a minimum coverage limit of $750,000 or an MCS-90 endorsement as a matter of law."  (*Id.* at PageID 382.)  Plaintiff counters that both Sixth Circuit precedent and Tennessee law require Enterprise to follow the FMCSR.  (ECF No. 41 at PageID 400.)

Taking Tennessee law first, Plaintiff asserts that two Tennessee regulations adopt the FMCSR.  (*Id.* at PageID 401 (citing Tenn. Comp. R. & Regs. 1340-06-01-.06(2), .08(1)).)  But as Defendant points out, these Tennessee regulations are irrelevant if the FMCSR does not apply to Enterprise.[4]  And Plaintiff cites no Tennessee courts holding that the FMCSR applies to a truck lessor or insurer.  Turning to Sixth Circuit precedent, Plaintiff argues that "an MCS-90 is incorporated into the Enterprise Policy as a matter of law."  (*Id.* at PageID 403.)  Plaintiff relies exclusively on the Sixth Circuit's decision in *Prestige Casualty Company v. Michigan Mutual Insurance Company*, 99 F.3d 1340 (6th Cir. 1996).

In *Prestige*, the Sixth Circuit considered "which of two insurance companies must provide primary coverage for liability arising out of a collision of a tractor-trailer and an automobile."  *Id.* at 1342.  The dispute was between Michigan Mutual which insured the motor carrier, and

---

[4] The Court further addresses Plaintiff's claims under Tennessee law in the section below.

Prestige which insured the individual who owned the truck and leased it to the carrier. *Id.* The court addressed "the effect Interstate Commerce Commission ("ICC") regulations . . . have on the relationship between insurers." *Id.* This included discussion of the "ICC-mandated endorsement, known as MCS-90," and "what effect the ICC endorsement has upon the determination of which insurer bears the ultimate burden of loss." *Id.* at 1346, 1348.

The *Prestige* court found that "[b]ecause [the motor carrier] is an interstate carrier operating pursuant to an ICC certificate and authority, the ICC endorsement is attached to Michigan Mutual's policy." *Id.* at 1348 (citing 49 C.F.R. § 387.15; 49 C.F.R. § 1043.1(a)). In a linked footnote, the court noted that "[a]lthough the ICC endorsement in fact is not attached to Michigan Mutual's policy, Michigan Mutual acknowledges that it is incorporated as a matter of law." *Id.* at 1348 n.6 (citing *Travelers Insur. Co. v. Transport Insur. Co.*, 787 F.2d 1133, 1139 (7th Cir. 1986); *Hagans v. Glens Falls Insur. Co.*, 465 F.2d 1249, 1252 (10th Cir. 1972)).

Plaintiff here says this means that an MCS-90 endorsement is automatically incorporated into the Enterprise Policy. (ECF No. 41 at PageID 403.) Defendant counters that the *Prestige* opinion "does nothing more than state a party's stipulation without explaining why the stipulation was made." (ECF No. 42 at PageID 415.) Defendant denies that *Prestige* creates any binding precedent on this issue. (*Id.*) But if the *Prestige* court based its finding solely on a stipulation of fact, why then would it include citations to other cases? For answers, the Court turns to the *Travelers* and *Hagans* opinions.

In *Travelers*, the court found that "[t]he [insurance] policy did not contain a printed [ICC] endorsement . . ., but it has been held that this endorsement may be read into a policy certified to the ICC as a matter of law." 787 F.2d at 1139 (citing *Hagans*, 465 F.2d at 1252). The *Travelers*

court relied exclusively on the Tenth Circuit's decision in *Hagans* for that conclusion.  And so all roads lead back to *Hagans*.

In that case, the Tenth Circuit held that although the relevant insurance policy lacked an ICC endorsement, "all parties proceed[ed] on the premise that the policy . . . contains such." 465 F.2d at 1252.  The court also noted that the defendant in *Hagans* "filed a certificate of insurance with the Interstate Commerce Commission certifying that it had issued [the insured] a policy which was amended by attachment of . . . an endorsement in order to be in conformity with the Commission's rules and regulations."  *Id.*  The court concluded, "[h]ence, we too assume that the policy . . . contained the required ICC endorsement."  *Id.*  And so the courts in both *Travelers* and *Hagans* had another reason for reading ICC endorsements into the relevant insurance policies—the certification of those policies to the ICC.

Likewise in *Prestige*—Michigan Mutual stipulated that its policy incorporated the endorsement.  99 F.3d at 1348 n.6.  And the Sixth Circuit stated that the motor carrier operated under "an ICC certificate and authority."[5]  *Id.* at 1348.  Plaintiff still asserts that *Prestige* holds that "[i]n the Sixth Circuit, an MCS-90 endorsement is incorporated into each policy 'as a matter of law.'"  (ECF No. 41 at PageID 407.)  But Plaintiff's stance is far too extreme.  *Prestige* does not hold that courts must read an MCS-90 endorsement into any insurance policy that might require it.

---

[5] The *Prestige* court, quoting from a case it found "directly on point," also stated, "[t]he fact that federal law imputes that provision *when the policy is certified* does not allow us to conclude that it is written in special ink which appears for cases involving the public and disappears in cases involving other insurers."  *Id.* at 1348–49 (emphasis added) (quoting *Zurich-American Ins. Co. v. Amerisure Ins. Co.*, 547 N.W.2d 52, 58 (Mich. App. 1996)).  This further suggests that *Prestige* involved an insurance policy certified to the ICC.

Similarly, in *Dupont*, one of the parties relied on *Prestige* to argue that "as a matter of law the MCS-90 endorsement should be incorporated into the policy, even if it is not physically attached to the policy." 326 F.3d at 669. But the Fifth Circuit distinguished *Prestige* emphasizing that "one of the insurers [in *Prestige*] conceded that the MCS-90 endorsement was incorporated into its policy as a matter of law even though it was not attached to the policy, and therefore the [Sixth Circuit] was not called upon to decide the issue here." *Id.* (citing *Prestige*, 99 F.3d at 1348 n.6).

The Fifth Circuit also noted that "[t]he regulations requiring the endorsement are directed at the motor carrier, not its insurer." *Id.* at 668. And the court questioned, as a matter of public policy, "the fairness of placing a duty on insurance companies to determine whether an insured is a motor carrier for hire, who engages in the interstate shipment of non-exempt goods, using non-exempt vehicles, and is otherwise subject to the Motor Carrier Act and its complex regulations." *Id.* at 669. The court found that "[t]he motor carrier is in the best position to know the nature of its business and the legal requirements for conducting that business." *Id.* And so the court held, "[s]ince the regulations requiring the MCS-90 endorsement are directed at the motor carrier, we do not read them as imposing a duty on the insurer to make sure that non-exempt motor carriers secure the required insurance." *Id.*

Many district courts have relied on *Dupont* in reaching the same conclusion about whether the MCA and FMSCR apply to insurers. *See Penske Truck Leasing Co, LP v. Safeco Ins. Co.*, 457 F. Supp. 3d 148, 157 (D. Conn. 2020) ("Penske is not a motor carrier within the meaning of the FMCSA and therefore has no obligations thereunder."); *Gen. Star Nat'l Ins. Co. v. Ginnetti Trucking, LLC*, No. 08-cv-2957, 2010 U.S. Dist. LEXIS 147890, at *13–14 (S.D.N.Y. Feb. 15, 2010) ("If [the carrier] determined that additional financial security was required under

federal regulations, it was [the carrier's] responsibility to negotiate coverage under the [insurer's] Policy and ensure that the proper endorsements were attached and filings occurred.  It is not [the insurer's responsibility to determine [the carrier's] financial security requirements."); *Brewer v. Maynard*, No. 2:02-0048, 2007 U.S. Dist. LEXIS 53512, at *7 (S.D. W. Va. July 20, 2007) ("The regulations place responsibility on the motor carriers, not their insurers.  Therefore, I do not read them as imposing a duty on the insurer to ensure that the motor carriers secure the required insurance."); *Carolina Cas. Ins. Co. v. Estate of Zinsmaster*, No. 1:06-CV-33-TS, 2007 U.S. Dist. LEXIS 14579, at *9 n.1 (N.D. Ind. Feb. 27, 2007) ("The Motor Carrier Act is not an insurance statute, and it is not [the insurer's] duty to make sure that the companies it insures comply with its provisions.").

Plaintiff tries to distinguish the above cases on factual grounds.[6]  But none of Plaintiff's arguments change the legal conclusion reached in those cases—that the MCA and FMCSR do not impose any duty on insurers to make sure motor carriers obtain conforming coverage.  Those cases conclude that the MCA and FMCSR place the burden of obtaining conforming coverage on the motor carrier.  And the Court agrees with those cases on this point.  The Court therefore finds that the MCA and FMCSR, in and of themselves, imposed no duty on Enterprise to determine whether Plaintiff obtained conforming coverage and otherwise complied with their provisions.

---

[6] In seeking to distinguish the cases discussed above, Plaintiff relies on its allegations related to what Defendant knew when it issued the Enterprise Policy, the representations Defendant made to Plaintiff both before and after issuing the policy, and what Defendant agreed to in the Master Agreement.  (ECF No. 41 at PageID 405–06.)  These facts do not speak to whether the MCA and FMCSR apply to insurers.  Rather, these allegations address whether Defendant agreed to provide coverage that conforms to the MCA and FMCSR.  Plaintiff also asserts that the Court has to accept as true the allegation that Enterprise assumed the duty to provide Plaintiff with conforming coverage.  (ECF No. 41 at PageID 405–06.)  But the Court need not accept as true allegations expressing legal conclusions.  *See Directtv, Inc.*, 487 F.3d at 476.  The Court gives no weight to any conclusory allegations in the complaint.

And the MCA and FMCSR consequently imposed no statutory duty on Enterprise to provide Plaintiff with liability coverage of $ 750,000 or an MCS-90 endorsement.

But this does not preclude an insurer from agreeing to provide a motor carrier with coverage conforming to the requirements in the MCA and FMCSR.  And the Court's conclusion here is also separate from whether the Court will read an MCS-90 endorsement into the contract. Plaintiff's fact-based arguments—related to what Defendant knew, said, and agreed to—will come into play in answering these questions.  At bottom, the Court finds that the MCA and FMCSR do not create statutory obligations for insurers to determine whether a motor carrier seeks or obtains conforming coverage.  And so the Court **GRANTS** Defendant's motion for partial dismissal as it relates to Plaintiff's request that the Court declare that the MCA and FMCSR imposed a "statutorily mandated" duty on Enterprise to provide or obtain coverage in the amount of $750,000 and issue an MCS-90 endorsement.  (ECF No. 37 at PageID 264.)

The Court now turns to whether Enterprise contractually agreed to provide that coverage or endorsement.  And so the Court will turn to the Master Agreement.  But first the Court will briefly address Plaintiff's remaining state law claims.

## II.    Plaintiff's State Law Claims

In responding to the motion to dismiss, Plaintiff argues that the motion fails to address Tennessee law.  (ECF No. 41 at PageID 394.)  As stated above, Plaintiff points to Tennessee regulations adopting the FMCSR's financial responsibility requirements for motor carriers.  *See* Tenn. Comp. R. & Regs. 1340-06-01-.06(2), .07, .08(1).  And Plaintiff asserts that Defendant violated a Tennessee statute related to insurance agent licensing requirements.  (ECF No. 41 at PageID 394 (citing Tenn. Code Ann. § 56-6-104(9)).)  Defendant argues in reply that Plaintiff did not cite or discuss the regulations or statute in the complaint.  (ECF No. 42 at PageID 410–

11.)  True enough, the complaint's prayer for relief did not reference state law, let alone any specific regulation or statute.  (ECF No. 37 at PageID 264–65.)  But the preceding section of the complaint, titled "Declaratory Relief Sought," asks the Court to declare that Defendant had a duty to provide or obtain "sufficient primary liability protection . . . compliant with state law, federal law, and the terms of the Master Truck Rental Agreement . . . ."  (*Id.* at PageID 263–64.)

This vague reference to state law is insufficient to provide notice to Defendant of a claim that it violated insurance agent licensing requirements under Tenn. Code Ann. § 56-6-104(9). The complaint never mentions that statute.  And the factual allegations never refer to agent licensing requirements.  Plaintiff alleges only that Defendant stated it would provide or obtain coverage compliant with state law but failed to do so.  Plaintiff asserts that "[t]he MCA, FMCSR, and Tennessee state law mandate that all insurance policies for commercial freight carriers such as Ballentine provide coverage of at least $750,000.00 and also contain an MCS-90 endorsement establishing financial responsibility of at least $750,000.00."  (ECF No. 37 at PageID 255.)  Plaintiff again references the "federal and state minimum liability coverage of $750,000.00" later in the complaint.  (*Id.* at PageID 258, 260, 261.)

Because Plaintiff did not plead any violation of Tennessee insurance agent licensing requirements, the Court will not consider Plaintiff's arguments related to the corresponding Tennessee statute.  "A claim not previously asserted cannot be raised in a response to a motion to dismiss."  *Pendleton v. Wal-Mart Supercenter*, No. 3:19-0695, 2020 WL 2201121, at *3 (M.D. Tenn. Apr. 13, 2020) (citing *Orea Energy Group, LLC v. E. Tenn. Consultants, Inc.*, 2009 WL 3246853, at *3 (E.D. Tenn. Oct. 6, 2009) ("[T]hese allegations are nowhere to be found in the complaint.  They are present only in plaintiff's briefing, and it is a basic principle that the

complaint may not be amended by the briefs in opposition to a motion to dismiss.")).  And so Defendant is entitled to dismissal on this state law claim.

As for the remaining claims under Tennessee law, Defendant contends that the Court should disregard them because Plaintiff did not "cite to and assert the applicability of any Tennessee statue or regulation" in the complaint.  (ECF No. 42 at PageID 411.)  As stated above, Plaintiff asserted that Tennessee law required $750,000 minimum liability coverage and an MCS-90 endorsement.  (ECF No. 37 at PageID 255.)  But Plaintiff's requests for a declaratory judgment over the MCS-90 endorsement refer only to the MCA and FMCSR.  (*Id.* at PageID 263–64.)  And Plaintiff's request for relief did not ask for a declaratory judgment stating that Tennessee law required minimum liability coverage of $750,000.  (*Id.* at PageID 263–65.)

The lone reference to state law in the section describing the requested relief asks the Court to declare that Defendant had a duty to provide or to obtain "sufficient primary liability protection . . . compliant with state law, federal law, and the terms of the Master Truck Rental Agreement . . . ."  (*Id.* at PageID 263–64.)  But this request does not make clear whether Plaintiff is asserting that this obligation is contractual or statutory.  And, as stated above, state law is noticeably absent from Plaintiff's later request that the Court declare that the MCA and FMCSR create "statutorily mandated" minimum liability coverage of $750,000.  (*Id.* at PageID 265.)  This suggests that Plaintiff's request for relief under Tennessee law stems from Defendant's contractual obligations rather than any Tennessee statute.

But in responding to the motion to dismiss, Plaintiff points to Tennessee regulations adopting the FMCSR's financial responsibility requirements for motor carriers.  (ECF No. 41 at PageID 401 (citing Tenn. Comp. R. & Regs. 1340-06-01-.06(2), 08(1)).)  One of the regulations adopts portions of the FMCSR, including its financial responsibility requirements.  *See* Tenn.

Comp. R. & Regs. 1340-06-01-.08(1).  The other adopts the FMCSR's "Insurance and Surety Bond forms."  *See* Tenn. Comp. R. & Regs. 1340-06-01-.06(2).  And so the Court construes Plaintiff's request for relief under Tennessee law as deriving from not only Defendant's contractual obligations but also the adoption and incorporation of the FMCSR's financial responsibility requirements into Tennessee law.

This Court found above that the FMCSR imposes burdens for requisite liability coverage only on motor carriers.  And Plaintiff cites no legal authority suggesting that courts interpret these Tennessee regulations differently.  In fact, Plaintiff cites no case law at all, let alone any Tennessee cases finding that these regulations impose obligations on parties other than motor carriers.  And the Court has identified no case law supporting Plaintiff's interpretation.  And so if Plaintiff's claims under Tennessee law stem from the FMCSR, the Court's conclusion in the section above also applies here.

Elsewhere in its response, Plaintiff seems to argue that Tennessee law gives rise to a statutory duty, apart from the FMCSR, to provide minimum coverage of $750,000.  (ECF No. 41 at PageID 395 (citing Tenn. Comp. R. & Regs. 1340-06-01-.06, .07).)  But, as stated above, Plaintiff did not include this assertion in its request for declaratory relief.  *See Pendleton*, 2020 WL 2201121, at *3.  What is more, as Defendant points out in its reply, Plaintiff incorrectly asserts that the Tennessee Commissioner of the Department of Commerce and Insurance adopted these regulations, which Plaintiff mistakenly calls "Tennessee insurance statutes."  (ECF No. 41 at PageID 395.)

Indeed, the Tennessee Commissioner of Safety and Homeland Security issued the regulations Plaintiff cites in its response.  *See* Tenn. Comp. R. & Regs. 1340-06-01-.06, .07, .08(1).  In fact, two of the regulations explicitly reference the Commissioner of Safety and

Homeland Security.  *See* Tenn. Comp. R. & Regs. 1340-06-01-.06(2), .08(1).  And all three cite the same statutory authority, Tenn. Code. Ann. § 65-15-106, which provides that "[t]he department of safety is vested with the power and authority, and it is its duty, to license, supervise and regulate *every motor carrier* in the state and promulgate rules and regulations pertaining thereto."  *Id.* (emphasis added).

The Tennessee regulations also contain language targeting motor carriers.  As stated above, one of the regulations merely adopts portions of the FMCSR.  *See* Tenn. Comp. R. & Regs. 1340-06-01-.08(1).  The more specific regulation states, "the Insurance and Surety Bond forms prescribed by the FMCSA for motor carriers operating in interstate commerce should *apply to all motor carriers* subject to the jurisdiction of the Commissioner[.]"  Tenn. Comp. R. & Regs. 1340-06-01-.06(2) (emphasis added).  And its other provision states that "[n]o *motor carrier* subject to the provisions of T.C.A. §§ 65-15-101 *et seq.*, shall engage in transportation of passengers or property for compensation" until that carrier files an insurance policy or surety bond in the right amount under Tenn. Comp. R. & Regs. 1340-06-01-.07, and the appropriate administrative authorities approve it.  Tenn. Comp. R. & Regs. 1340-06-01-.06(1)(a) (emphasis added).

And so, even assuming these Tennessee regulations impose duties beyond those imposed by the FMCSR, they contain no language suggesting they apply to any parties other than motor carriers.  And again, Plaintiff has not provided—and the Court has not found—any cases interpreting these Tennessee regulations differently.  The Court therefore finds that, based on the above and for the reasons stated in the section analyzing the MCA and FMCSR, Plaintiff has no right to relief under the Tennessee statute and regulations cited.

The Court will now determine whether Enterprise contractually agreed to provide minimum liability coverage of $750,000 or an MCS-90 endorsement.  And so the Court turns to the Master Agreement.

## III.    Insurance Coverage Required by the Master Agreement

The parties dispute the amount of minimum coverage required by the Master Agreement. Defendant argues that the Master Agreement "clearly and unambiguously provides that Ballentine is required to maintain commercial vehicle insurance with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000."  (ECF No. 40-1 at PageID 372.)  Plaintiff claims that these minimum split limits provided in the Master Agreement do not apply because Plaintiff bought insurance from Enterprise.  (ECF No. 41 at PageID 396–97.)  Both parties agree that Tennessee law applies when interpreting the Master Agreement.  (ECF Nos. 40-1 at PageID 373; 41 at PageID 395–96, 400.)

In Tennessee, "the intent of the contracting parties at the time of executing the agreement" governs contract construction, and "[t]he intent of the parties is presumed to be that specifically expressed in the body of the contract."  *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) (citation omitted); *see also Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, 566 S.W.3d 671, 688 (Tenn. 2019) ("The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles." (citations omitted)).  And so the Court should determine whether "the literal meaning" of the contractual language can resolve the parties' disagreement. *See Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008); *see also Planters Gin*

*Co.*, 78 S.W.3d at 890 ("If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes."); *Perkins v. Metro. Gov't of Nashville & Davidson Cnty.*, 380 S.W.3d 73, 85 (Tenn. 2012) ("[C]ourts must construe contracts as a whole and ascertain the parties' intent from the usual, natural, and ordinary meaning of the contractual language." (internal quotation marks and citations omitted)).

As stated above, the Master Agreement has this to say about  insurance requirements:

> Customer agrees at a minimum to obtain and maintain in full force and effect at all times throughout the term of this Agreement the following insurance coverages with respect to the acts or omissions of Customer and/or any of its employees or agents (including all Drivers) and provide a certificate of insurance evidencing:

> (a)    unless liability protection for accidents arising out of the operation or use of each Rental Truck is included in the Base Rental Rate as set forth on the applicable Schedule A, commercial vehicle insurance, including bodily injury liability and property damage liability coverages, covering owned, non-owned and hired autos (including Rental Trucks rented under this Agreement) and insuring Customer's liability for negligence arising out of the use or operation of vehicles by its employees or agents (including all Drivers) with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000; and, where required by law, uninsured and/or underinsured liability coverage, uninsured and/or underinsured property damage coverage and/or personal injury protection in an amount equal to the minimum amount required by applicable state law;

> (b)    Physical Damage Insurance (Collision & Comprehensive: Actual cash value of the applicable Rental Truck) covering all Rental Trucks rented pursuant to this Agreement.

> Each insurance policy set forth above shall name Enterprise as an additional insured for Customer's contractual obligations under this Agreement and shall include an endorsement stating that such insurance shall not be canceled, modified such that the minimum limits or requisite coverages are no longer in force or non-renewed without thirty (30) days prior written notice to Enterprise.   Customer hereby acknowledges and agrees that the insurance required to be maintained by it under this Section provides "primary coverage" for the protection of Customer with respect to the acts or omissions of Customer and/or any of its employees or agents (including all Drivers) notwithstanding any other coverage carried by Customer or

Enterprise insuring against similar risks.  All insurance shall be written through companies having an A.M. Best's rating of at least A-VII or with such other companies as may reasonably be approved by Enterprise.  Customer waives all rights against Enterprise and its agents, officers, directors and employees for recovery of damages to the extent these damages are covered by the insurance required to be maintained hereunder.  Physical damage coverage shall name Enterprise as a loss payee.  Notwithstanding anything to the contrary, should Customer by provided Liability Protection in the rental rate per the applicable schedule, such Liability Protection shall be primary, subject to its terms and conditions, to any similar liability coverage maintained by customer.

(ECF No. 37-1 at PageID 271–72.)

According to the Master Agreement's plain language, two situations can arise related to Plaintiff's insurance coverage.  In the first scenario, "liability protection for accidents arising out of the operation or use of each Rental Truck is included in the Base Rental Rate as set forth on the applicable Schedule A."  (ECF No. 37-1 at PageID 271.)  And in the second scenario—when the Base Rental Rate does not include liability protection—Plaintiff must obtain and maintain "commercial vehicle insurance . . . insuring Customer's liability for negligence arising out of the use or operation of vehicles by its employees or agents (including all Drivers) with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000."  (*Id.* at PageID 271–72.)  The question is whether those same minimum limits apply in the first scenario. [7]

Defendant argues that the Master Agreement means Plaintiff either had to obtain insurance coverage with the minimum 100/300 splits listed above or "obtain liability protection from Enterprise that includes the[se] levels of liability protection . . . in the base rental rate charged."  (ECF No. 40-1 at PageID 375.)  According to Defendant, when the contract uses

---

[7] The parties both implicitly concede through their arguments that this case falls within the first scenario.  (ECF Nos. 40-1 at PageID 375; 41 at PageID 396.)

"unless" in the above provision, it meant that if Plaintiff bought insurance from Enterprise, Plaintiff "was no longer required to provide Enterprise with a certificate showing the limits, that it was issued by a properly rated insurance company, or Enterprise listed as a loss payee and additional insured." (*Id.*)

   Plaintiff counters that the Master Agreement only provided "minimally required limits for outside commercial vehicle insurance." (ECF No. 41 at PageID 396.)  But those limits did not apply for insurance Plaintiff bought directly from Enterprise. (*Id.*)  And so Plaintiff says that the minimum 100/300 split limits apply only if it bought insurance from an outside insurer. (*Id.* at PageID 397.)

   Plaintiff then points to Schedule A to the Master Agreement, which provides that "[n]otwithstanding any term to the contrary in the Agreement, the Base Rental Rate . . . does not include liability protection for accidents arising out of the operation or use of the Rental Truck with N/A[8] upon the terms and subject to the limitations set forth in the applicable Rental Contract and in the insurance policy which provides coverage." (ECF No. 37-1 at PageID 268.)  Plaintiff contends that this means the applicable rental contract and insurance policy will set forth the limitations for liability protection. (ECF No. 41 at PageID 396.)  And so Plaintiff asserts that "the Rental Contract between Ballentine and Enterprise *should* state the limits of liability protection, and a corresponding insurance policy should provide coverage for those agreed limits." (*Id.* at PageID 397 (emphasis in original).)  Plaintiff contends that the rental contract fails to state the limits of liability protection. (*Id.*)

   The rental contract, which Plaintiff attached to its complaint, provides notice that liability protection is optional and contains boxes where the lessee can reflect acceptance or denial of

---

[8] Neither party explains the curious use of the term "N/A" in this provision of Schedule A.

optional supplemental liability protection ("SLP").  (ECF No. 37-2 at PageID 275.)  On the rental contract here, Plaintiff did not check either box.  (*Id.*)  Instead, the space next to these boxes has this language: "NO SLP. BTI INCLUDED SEE MASTER AGREEMENT."  (*Id.*) And so the rental contract calls for no supplemental liability protection and refers the reader to the Master Agreement for more information about "BTI".  (*Id.*)  Given that this writing appears next to the boxes for optional insurance coverage, "BTI"[9] seemingly refers to some form of insurance.

And the Master Agreement only requires commercial vehicle insurance coverage to insure the "Customer's liability for negligence arising out of the use or operation of vehicles by its employees or agents (including all Drivers) with minimum split limits of $100,000 bodily injury or death per person, $300,000 bodily injury or death per occurrence and $50,000 property damage per occurrence, or a combined single limit of $300,000."  (ECF No. 37-1 at PageID 271–72.)  But under Plaintiff's interpretation of Schedule A to the Master Agreement, the "insurance policy which provides coverage" can also set the applicable split limits.  And Plaintiff alleges that the Enterprise Policy it bought provides $750,000 in coverage.[10]  (ECF No. 37 at PageID 265.)

According to Defendant, because the Master Agreement contemplates no other liability protection, aside from the coverage with the minimum split limits described above, the Court should find that the Master Agreement requires Plaintiff to maintain coverage with those split limits.  (ECF No. 40-1 at PageID 372.)  True enough, the Master Agreement contains no other

---

[9] Yet again, neither party explains what the term "BTI" means.

[10] Defendant produced an insurance policy during the underlying state court litigation that provides coverage with the split limits described in the Master Agreement.  (ECF No. 37-9.) Plaintiff asserts that this policy is not the Enterprise Policy.  (ECF No. 37 at PageID 265.)

liability protection limitations.  But Defendant does not address the fact that Schedule A to the Master Agreement, when discussing liability protection, raises the possibility of "limitations set forth in the applicable Rental Contract and in the insurance policy which provides coverage." (ECF No. 37-1 at PageID 268.)  Nothing in Defendant's reply addresses how the Court should interpret this contractual language.  And "a motion for judgment on the pleadings . . . may be granted only if the moving party is . . . *clearly* entitled to judgment."  *JPMorgan Chase Bank, N.A.*, 510 F.3d at 581 (emphasis added) (internal quotation marks omitted).

The Court finds that the language of the contract is ambiguous over what liability protection limits apply.  And so the Court **DENIES** Defendant's motion related to its contractual obligations under the Master Agreement.

## <u>CONCLUSION</u>

Based on the above, the Court **DENIES** Defendant's motion for partial judgment on the pleadings and **GRANTS IN PART** and **DENIES IN PART** Defendant's motion for partial dismissal.

**SO ORDERED**, this 17th day of February, 2022.

s/ Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE